UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARLA REID-WITT,
on behalf of C.W.,

    *Plaintiff*,

v.

DISTRICT OF COLUMBIA,

    *Defendant*.

Civil Action No. 1:19-cv-02473 (CJN)

## MEMORANDUM OPINION

C.W. was a student at Washington's Benjamin Banneker High School before her disabilities interfered with her studies. *See generally* Am. Compl., ECF No. 7. She was granted various accommodations but her multiple requests for special-education services were denied. *See generally id.* Unable to maintain consistent attendance, C.W. fell below the requirements for continued enrollment and the school asked her to withdraw. *See generally id.* After exhausting administrative remedies, C.W's mother, Karla Reid-Witt, filed this suit alleging a violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and disability discrimination under the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et seq*. *See generally* Am. Compl. The District moves to dismiss the discrimination counts for failure to state a claim. *See generally* Def.'s Partial Mot. to Dismiss Pl.'s Am. Compl. ("Mot."), ECF No. 8. For the reasons explained below, the Court grants the Motion in part and denies it in part.

1

## I.     Background

Banneker is a selective public high school; among other requirements, students must maintain a minimum grade-point average and a record of community service to remain enrolled.[1] Am. Compl. ¶ 74.  C.W. entered Banneker in the ninth grade during the 2016–17 school year. *Id.* ¶ 13.  She suffers from anxiety and depression, which cause difficulties with "[self-]organization, time management, completing assignments, memory, and focus," as well as at least two instances of suicidal ideation.  *Id.* ¶¶ 14–15, 47–49.

After a breakdown caused C.W.'s temporary hospitalization in the middle of ninth grade, Reid-Witt requested that the District of Columbia Public Schools (DCPS) arrange an IDEA Individual Education Program for C.W. to complete either at home or in the hospital.  *Id.* ¶ 18. Reid-Witt supplied supporting documentation from C.W.'s therapist.  *Id.* ¶ 20.  C.W. remained hospitalized for a portion of the spring semester and "attended Banneker on a part-time basis," but DCPS did not respond to Reid-Witt's request for home study.  *Id.* ¶¶ 19, 25.  After C.W. returned to school full-time in May 2017, DCPS informally notified Reid-Witt that C.W. was ineligible for home instruction.  *Id.* ¶¶ 26–28.  DCPS instead issued an accommodation plan under section 504 of the Rehabilitation Act that permitted C.W. to drop two courses and gave her various testing and learning accommodations.  *Id.* ¶ 30; *see also* Section 504 Plan of Jun. 9, 2017, ECF No. 8-1.  C.W. missed 71 days of the ninth grade.  Am. Compl. ¶ 31.

Before C.W.'s tenth-grade year commenced, DCPS formally denied Reid-Witt's request for special-education services.  *Id.* ¶¶ 32–34.  It also rejected a request to use an assistive electronic device in class.  *Id.* ¶¶ 37–40; *see also* Section 504 Plan of Aug. 31, 2017, ECF No.

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

8-2; Section 504 Plan of Sep. 5, 2017, ECF No. 8-3.  C.W. missed 67 days of school during the tenth grade, including one incident during which she ran away from school for the day and another instance of suicidal ideation that required hospitalization.  Am. Compl. ¶¶ 42–49.  DCPS kept the accommodations in place but maintained its position that C.W. was ineligible for special-education services.  *Id.* ¶¶ 50–53.

The Parties reached an impasse during the eleventh-grade year.  C.W. attended school only one day that year, and DCPS repeatedly rejected Reid-Witt's requests for special-education services.  *Id.* ¶¶ 54–72; *see also* Section 504 Plan of Aug. 27, 2018, ECF No. 8-4.  The school informed Reid-Witt that C.W.'s grade-point average and record of community-service hours had fallen below the acceptable minimums and asked her to transfer to one of the District's non-selective high schools.  Am. Compl. ¶¶ 73–78; Def.'s Ltr. of Feb. 25, 2019, ECF No. 8-5.  Reid-Witt decided instead to homeschool C.W. for the 2019–20 school year but has been largely unsuccessful because of C.W.'s disabilities.  *Id.* ¶¶ 85–89.

Reid-Witt filed an administrative complaint alleging both the denial of a Free Appropriate Public Education and disability discrimination.  *Id.* ¶ 1; *see also* 34 C.F.R. § 104.33(a) ("A recipient [of federal funding] that operates a public . . . secondary education program . . . shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.").  On June 10, 2019, a Hearing Officer denied the complaint after finding that C.W. did not qualify for special education under the IDEA and that he lacked jurisdiction over the discrimination claim.  Am. Compl. ¶¶ 90–100; Hearing Officer's Decision, ECF No. 1-1.  Reid-Witt then filed this lawsuit.  The Amended Complaint contains three counts:  (I) a challenge to the denial of the IDEA complaint, *id.*; (II) disability discrimination under the Rehabilitation Act,

*id.* ¶¶ 101–75; and (III) disability discrimination under the ADA and the DCHRA, *id.* ¶¶ 176–256. The District moves to dismiss in part, arguing that Counts II and III fail to state a claim. *See generally* Mot. The District does not yet challenge Count I. *See id.* at 1.

## II.     Legal Standard

Ordinarily, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted). Although the Court accepts all well pleaded facts in the Complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 554–55 (internal quotations and citations omitted). The claim to relief must be "plausible on its face," enough to "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570. The Court may also consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).[2]

---

[2] Reid-Witt attached a copy of the Hearing Officer's Decision to her original Complaint, ECF No. 1, but attached nothing to her Amended Complaint. *See generally* Hearing Officer's Decision. The District attached to its Motion all four versions of C.W.'s "Section 504 Plan," which outline specific disability accommodations the school granted at various times and which Reid-Witt referenced in the Amended Complaint. ECF Nos. 8-1–8-4; *see also* Am. Compl. ¶¶ 30, 34, 52, 99 (referencing the plans). It also attached the letter in which it asked C.W. not to

### III.     Analysis

Reid-Witt's claims fall into three distinct categories even though they arise out of the same events.  In Count I, Reid-Witt challenges the Hearing Officer's administrative determination that C.W. was ineligible for special-education services under the IDEA.  Am. Compl. ¶¶ 90–100.  The IDEA is the primary vehicle for such claims and "is of particular importance in this case."  *Holmes-Ramsey v. District of Columbia*, 747 F. Supp. 2d 32, 35 (D.D.C. 2010).  One of the Act's purposes is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  "'Implicit' in the IDEA's guarantee 'is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child.'"  *Holmes-Ramsey*, 747 F. Supp. 2d at 35 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 200 (1982)).  To qualify for protection under the IDEA, a student must have a disability and, "by reason thereof, need[] special education and related services."  20 U.S.C. § 1401(3)(A).

The IDEA and its implementing regulations establish a comprehensive administrative process for adjudicating disputes, including the ability to file a due-process complaint and obtain an adjudication from a Hearing Officer.  20 U.S.C. § 1415; 34 C.F.R. §§ 300.507–15.  Complainants who are "aggrieved by the findings and decisions made" by the Hearing Officer may "bring a civil action with respect to the complaint" in the district court.  20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516.  It is that administrative process in which students and their

---

return to Banneker.  ECF No. 8-5, *see also* Am. Compl. ¶ 166 (referencing the letter).  Reid-Witt does not seem to object to the Court's consideration of those documents.

families may challenge the alleged denial of a Free Appropriate Public Education because of particular problems with a student's Individual Education Plan, or, as in this case, the determination that a student is ineligible for such services altogether. *Id.* Reid-Witt filed such a complaint and, having received an adverse determination, seeks judicial review of that decision in Count I. Am. Compl. ¶¶ 90–100. If Reid-Witt prevails on her IDEA claim, she will be entitled only to equitable relief in the form of compensatory education and reimbursement for out-of-pocket costs of "educational placements or related services to which [she] is later found to be entitled." *Walker v. District of Columbia*, 969 F. Supp. 794, 795–96 (D.D.C. 1997).

Reid-Witt's other two sets of claims allege disability discrimination more generally. The IDEA does not preclude a student from raising additional claims under other statutes so long as the student first exhausts her administrative remedies under the IDEA. 20 U.S.C. § 1415(l). Unlike the IDEA, the Rehabilitation Act, ADA, and DCHRA may permit recovery of compensatory damages and other remedies. *Walker*, 969 F. Supp. at 797–98; *but see Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 19 (1st Cir. 2006) ("Where the essence of the claim is one stated under the IDEA . . . , no greater remedies than those authorized under the IDEA are made available by recasting the claim as one brought under [other causes of action]."). Reid-Witt alleges a failure to accommodate C.W.'s individual disabilities under the Rehabilitation Act in Count II, Am. Compl. ¶¶ 101–69, and under the ADA and DCHRA in Count III, *id.* ¶¶ 176–250.

Buried within those two counts, however, is a third theory of liability. Reid-Witt alleges that Banneker had no special-education students during the last few years and suggests that that fact implies that Banneker does not offer special education at all, calling into question whether DCPS's denials of Reid-Witt's requests were genuine. Am. Compl. ¶¶ 79–81. She therefore alleges that the District has an illegal policy-or-practice of refusing to fund special-education

6

programs at its selective high schools, denying such services to students at those schools under the pretext that the students do not qualify for them, and funneling the students to less competitive high schools where such services are available. Am. Compl. ¶¶ 170–75; 251–56.

"While the [IDEA] addresses incorrect or erroneous special education treatment, the ADA[, Rehabilitation Act, and DCHRA] address[] discrimination against the disabled student." *Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 126 (D.D.C. 2011). Because the IDEA's administrative process is the primary vehicle for adjudicating educational disputes, courts require plaintiffs to show "something more than a mere failure to provide the 'free and appropriate education' required by the [IDEA]" to state a claim under the other statutes. *Walker*, 969 F. Supp. at 797 (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1580 (D.C. Cir. 1984)). Here, the District argues that Reid-Witt fails to make that showing and moves to dismiss Counts II and III in their entirety. *See generally* Mot.

### A.   As-Applied Disability Discrimination Claims

#### 1.   Count II:  Rehabilitation Act

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a), including "a local educational agency," *id.* § 794(b)(2)(B). It incorporates the ADA's standards for evaluating disability-discrimination claims. *Id.* § 794(d). To state a claim, Reid-Witt must therefore plausibly allege "(1) that [C.W.] is qualified under the Acts; (2) that [C.W. was] excluded from participation in[ or has] been denied the benefits, services, programs, or other activities for which the [District] is responsible or otherwise discriminated against; and (3) that the exclusion, denial, or discrimination [was] by reason of [C.W.'s] disability." Pl.'s Opp'n to Def.'s 2d Partial Mot. to

7

Dismiss ("Opp'n") at 4, ECF No. 10 (citing *Seth v. District of Columbia*, No. 18-cv-1034, 2018 WL 4682023, at *9 (D.D.C. Sep. 28, 2018); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250 (D.D.C. 2015)). Reid-Witt alleges a failure to accommodate C.W.'s disabilities but does not allege disparate treatment or impact. Opp'n at 4 (citing *Seth*, 2018 WL 4682023 at *10).

          *a.*      *Legal Standard for Evaluating Alleged Discrimination*

As explained above, to state a Rehabilitation Act claim in the educational context, Reid-Witt must satisfy the general criteria for disability discrimination and must also allege "something more than a mere failure to provide the 'free appropriate education' required by [the IDEA]." *Lunceford*, 745 F.2d at 1580 (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982)). In other words, "[she] must show that . . . [C.W.] was discriminated against '*solely* by reason of [her] handicap.'" *Walker*, 969 F. Supp. at 797 (quoting 29 U.S.C. § 794(a)) (emphasis added). To make *that* showing, judges in this jurisdiction typically require a plaintiff to allege either "bad faith or gross misjudgment on the part of a defendant." *Jackson*, 826 F. Supp. 2d at 122.

The D.C. Circuit has never squarely adopted that standard, but in *Lunceford* (which dealt with claims under the Rehabilitation Act and the Education for All Handicapped Children Act), it quoted the Eighth Circuit's decision in *Monahan* for the general proposition that the Rehabilitation Act requires more than just a showing that the school's response was inadequate. *See Lunceford*, 745 F.2d at 1580 (quoting *Monahan*, 687 F.2d at 1170). Judge Friedman later looked to *Monahan* for more guidance and adopted its "bad faith or gross misjudgment" standard. *See Walker*, 969 F. Supp. at 797 (quoting *Monahan*, 687 F.2d at 1170–71). All other judges in this District who have faced the question seem to have followed suit. *See, e.g.*, *R.S. v. District of Columbia*, 292 F. Supp. 2d 23, 28 (D.D.C. 2003) (Huvelle, J.); *Henneghan v. DCPS*, 597 F. Supp. 2d 34, 37 (D.D.C. 2009) (Kennedy, J.); *Holmes-Ramsey*, 747 F. Supp. 2d at 38–39

8

(Kollar-Kotelly, J.); *Alston v. District of Columbia*, 770 F. Supp. 2d 289, 298 (D.D.C. 2011) (Urbina, J.); *Jackson*, 826 F. Supp. 2d at 122 (Rothstein, J.); *B.D. v. District of Columbia*, 66 F. Supp. 3d 75, 80 (D.D.C. 2014) (Leon, J.); *DL v. District of Columbia*, 109 F. Supp. 3d 12, 23–24 (D.D.C. 2015) (Lamberth, J.).

Reid-Witt nevertheless argues for a different standard. She contends that, rather than "bad faith or gross misjudgment," she should only have to allege "deliberate indifference." Opp'n at 5. She relies primarily on *Pierce* for the proposition that "the Rehabilitation Act and ADA are targeted to address more subtle forms of discrimination than merely obviously exclusionary conduct, and it is consistent with these motivations to employ a standard of deliberate indifference, rather than one that targets animus." 128 F. Supp. 3d at 278 (internal quotations omitted). But *Pierce* dealt with accommodations for prisoners, not students, *id.* at 254, and the obvious distinction is that the IDEA provides a separate process for students' claims. Reid-Witt's other citations fare no better. *See* Opp'n at 5 (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (adopting deliberate-indifference standard for patient's claim against hospital); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (evaluating patron's claim against zoo under the deliberate-indifference standard)).

To be sure, some courts elsewhere have applied the deliberate-indifference standard to students' claims; *Pierce* cited one such decision. *See* 128 F. Supp. 3d at 278 (citing *S.H. ex rel Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)); *see also* Opp'n at 6–7 (citing *H. v. Montgomery Cty. Bd. of Educ.*, 784 F. Supp. 2d 1247, 1267–68 (M.D. Ala. 2011)). But *Pierce* had no occasion to address the educational context and did not cite any cases in this jurisdiction applying the tougher standard. *See* 128 F. Supp. 3d at 278–79. Likewise, *S.H.* took its standard from non-school Rehabilitation Act decisions without considering the interplay with

9

the IDEA, 729 F.3d at 262–63, and *H.* only used the deliberate-indifference standard because the parties there argued that it applied, so the court assumed that it was relevant without deciding the question, 784 F. Supp. 2d at 1261.

Perhaps realizing that her citations do not sufficiently explain why the Court should depart from the standard applied by other judges in this district, Reid-Witt argues that "[d]eliberate indifference [is] just as bad if not worse than gross misconduct or bad faith." Opp'n at 6. She relies heavily on a magistrate judge's unpublished opinion containing a long discussion on the relationship between the two standards and how some conduct may satisfy either one. *See* Opp'n at 6 (citing *Hamilton Sch. Dist. v. Doe*, No. 04-C-876, 2005 WL 3240597 (E.D. Wis. Nov. 29, 2005)). There's some merit to that argument; a plaintiff fails to show bad faith or gross misjudgment if the "officials involved have exercised professional judgment[] in such a way as not to depart grossly from accepted standards among educational professionals." *Walker v. District of Columbia*, 157 F. Supp. 2d 11, 35–36 (D.D.C. 2001) (quoting *Monahan*, 687 F.2d at 1171). That requirement is similar to the deliberate-indifference standard prisoners must meet in Eighth Amendment claims alleging insufficient medical attention. *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). "[I]n those cases where unnecessary risk may be imperceptible to a lay person[,] . . . a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc) (internal quotation omitted).

It's possible, therefore, that deliberate indifference might be *evidence* of bad faith or gross misjudgment, *cf. T.W. ex rel Wilson v. Sch. Bd. of Seminole Cty.*, 610 F.3d 588, 604–05 (11th Cir. 2010) (distinguishing between the two standards and declining to take a position), but

Reid-Witt has not given the Court any reason to depart from the more stringent standard plaintiffs must meet to state a Rehabilitation Act claim in conjunction with an IDEA claim.

        b.       *Reid-Witt's Allegations*

For Count II to survive the Motion, Reid-Witt must therefore allege both that the District discriminated against C.W. "solely by reason of [her] handicap" and that it exhibited "bad faith or gross misjudgment" in doing so. *Walker*, 157 F. Supp. 2d at 35 (internal quotations omitted). "Only in the rarest of cases will a plaintiff be able to prove that a school system's conduct is so persistent and egregious as to warrant such a unique remedy not otherwise provided for by the IDEA itself." *Id.* at 36. In *Douglass*, for example, a student challenged a DCPS policy that prohibited him from earning graduation credit by taking special-education classes. *Douglass v. District of Columbia*, 605 F. Supp. 2d 156, 168 (D.D.C. 2009). That amounted to an allegation of gross misjudgment, the court held, because it alleged a facially discriminatory policy. *Id.*

In other cases, courts have dismissed Rehabilitation Act claims because they usually "amount to garden variety IDEA violations and . . . contain[] no indication that the[] alleged violations occurred due to gross misjudgment." *Holmes-Ramsey*, 747 F. Supp. 2d at 39.[3] In *Walker*, "conduct including misdiagnosing a student's disability, failing to provide an [Individual Education Plan] for several school years and failing to provide an appropriate placement for five years collectively did not meet th[e] standard." *Alston*, 770 F. Supp. 2d at 300 (citing *Walker*, 157 F. Supp. 2d at 13–14). Other cases involved similar facts. *See id.* (collecting cases).

Here, Reid-Witt cannot plausibly allege that the District was *completely* indifferent to C.W.'s disabilities. The school promulgated four separate accommodation plans allowing C.W.

---

[3] In *Henneghan*, the court appears to have been generous in permitting a *pro se* plaintiff's claim to move forward. 597 F. Supp. 2d at 37.

extra time to turn in assignments, the ability to complete and turn in work virtually, alternative testing times and locations, a pass to leave class at any time to see a school counselor, periodic psychological services, automatic distribution of class lecture notes or PowerPoint presentations, preferential seating in classrooms, increased progress monitoring and reporting, the ability to accumulate community service hours under alternative arrangements, and special conditions during standardized testing. *See, e.g.*, Section 504 Plan of Aug. 31, 2017. Those steps surely do not amount to complete indifference to C.W.'s circumstances.

Reid-Witt instead points to the following events as indications of the District's bad faith: (1) the failure to grant accommodations recommended by C.W.'s physician, including home study, Am. Compl. ¶¶ 124, 130, 132, 147–50; (2) the failure to augment accommodations when they proved ineffective over time, *id.* ¶¶ 137–39, 143–44, 146, 154–58, 162–65; and (3) the District's decision to transfer C.W. from Banneker to a less competitive high school rather than accommodate her disability, *id.* ¶¶ 166–75. But the cases on which she relies in arguing that she has adequately alleged bad faith are distinguishable. In *H.*, the court found that a failure to update a student's section 504 plan three years in a row could constitute deliberate indifference, but it made no observations about whether that same conduct may have constituted bad faith or gross misjudgment. *See* Opp'n at 6 (citing *H.*, 784 F. Supp. 2d at 1267–68). Likewise, in *K.D. ex rel J.D. v. Starr*, an unexplained rescission of an accommodation recommended by the child's doctor *plus* a consistent failure to implement accommodations the school had already approved in a Section 504 Plan stated a claim for bad faith or gross misjudgment. *See* Opp'n at 6–7 (citing 55 F. Supp. 3d 782 (D. Md. 2014)). Reid-Witt has not alleged any such conduct here.

Finally, Reid-Witt looks to an Eighth Circuit case in which school officials may have exhibited bad faith or gross misjudgment by failing "to address a student's needs with a parent

12

by returning phone calls." Opp'n at 7 (citing *M.P. ex rel K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 982–83 (8th Cir. 2003)).  A closer look at that decision, however, reveals that those officials (1) failed to update the student's Section 504 Plan after his family disclosed to the school that the student had been diagnosed with schizophrenia; (2) failed to return the mother's weekly phone calls to discuss both ongoing harassment of the student by other students because of his disability and the school's plan "to either drastically alter [the student's] school day or send him to an alternative school for behaviorally troubled students;" and (3) promised (prior to enrollment) to cover the costs of transporting the student to school and then withdrew that promise and left the student to pay for his own transportation after he matriculated.  *M.P.*, 326 F.3d at 982.  Here, Reid-Witt has not alleged that the District failed to craft Section 504 Plans or failed to implement the accommodations those plans laid out in response to diagnoses from C.W.'s physician, nor has she alleged that the District rescinded benefits it had promised to confer or failed to address C.W.'s diagnosis altogether.

Allegations that the District failed to grant specific accommodations and failed to update accommodations over time are central to Reid-Witt's claim.  Am. Compl. ¶¶ 124, 146–47, 162.  But those allegations amount to "garden variety IDEA violations" and are not cognizable under the Rehabilitation Act.  *Holmes-Ramsey*, 747 F. Supp. 2d at 39.  Reasonable minds can disagree about which accommodations are appropriate (or even feasible), and the Amended Complaint's own allegations state that the District at least engaged with those questions, even if the answers may not have been optimal.  Reid-Witt has not stated a claim for failure to accommodate C.W.'s disabilities under the Rehabilitation Act.

### 2. Count III: ADA & DCHRA

The as-applied portion of Count III repeats Count II's allegations under different statutory causes of action.  Am. Compl. ¶¶ 176–250.  The ADA provides that "no qualified

13

individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "A regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R. § 35.130(b)(7)).  Claims under the DCHRA, in turn, are subject to the same standards as ADA claims, so the analysis merges.  *A.M. v. Bridges Pub. Charter Sch.*, No. 17-cv-177, 2019 WL 1932579, at *2 n.7 (D.D.C. May 1, 2019).

The Parties argue at length over whether C.W. is a "qualified individual" and whether the denial of particular accommodations she requested—to include special-education services—was done "by reason of [her] disability."  42 U.S.C. § 12132.  But to the extent that Reid-Witt challenges the District's determination that C.W. was ineligible for an Individual Education Plan or the school's failure to grant particular accommodations, those allegations are duplicative of the IDEA claim contained in Count I and therefore fail to state a claim.

The ADA's standard is slightly less strict than the Rehabilitation Act's standard because it does not require that the discrimination be "solely" because of C.W.'s disability; the disability must simply be a motivating factor in the alleged discrimination.  *Alston*, 770 F. Supp. 2d at 297 (citing *Foster v. Arthur Andersen, L.L.P.*, 168 F.3d 1029, 1033 (7th Cir. 1999), *abrogated on other grounds by Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010)).  But as with the Rehabilitation Act, "something more than a mere violation of the [IDEA] is necessary in order to show a violation of the ADA."  *Jackson*, 826 F. Supp. 2d at 126.  When pressed at oral argument on the question of how her allegations in Count III differ from those in Count I, Reid-Witt pointed repeatedly to accommodations she requested but which C.W. did not receive, such

as permission to take photographs of the whiteboard during and after class to augment her notes. Those sorts of allegations again "amount to garden variety IDEA violations" and are not cognizable under the ADA or DCHRA.  *Holmes-Ramsey*, 747 F. Supp. 2d at 39.

### B.  Policy-or-Practice Claim

Beneath Reid-Witt's allegations of specific failures to accommodate C.W.'s disabilities, however, lurks another claim that is different in kind.  Reid-Witt argues, and the District concedes, that C.W. is a D.C. resident and therefore entitled to a free, public education.  *See* Opp'n at 9 (citing 5A DCMR § 5001.1); Def.'s Reply in Supp. of its Partial Mot. to Dismiss Pl.'s Am. Compl. ("Reply") at 8–9, ECF No. 11.  That fact, Reid-Witt contends, is enough to establish that C.W. was a qualified individual under the Rehabilitation Act, ADA, and DCHRA and was therefore entitled to special-education services at Banneker.  Opp'n at 9.

The District gives two responses.  It first argues that C.W.'s request for home instruction was unreasonable as a matter of law because it sought "'to expand the substantive scope of a program or benefit,' which is not required under the ADA or [the Rehabilitation Act.]"  Reply at 12 (quoting *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008)). Second, the District contends that, even with the many accommodations it granted her, C.W. still failed to maintain the minimum grade-point average or accumulate enough hours of community service to continue her enrollment at Banneker and so was unqualified to attend Banneker with or without special-education services.  Reply at 9.

The District's first argument seems to respond directly to Reid-Witt's allegations that Banneker High School offers no special-education services whatsoever.  According to the Amended Complaint, Banneker "does not have any students with [Individual Education Plans]" under the IDEA and "does not have any special education teachers . . . [or] administrators."  Am. Compl. ¶¶ 172–74; 253–55.  Based on that information, Reid-Witt alleges that the school

15

repeatedly denied her requests for special education not because C.W. did not qualify for them, as the school insisted, but because Banneker lacked the capability to provide them.  Opp'n at 16–17.  She alleges that "DCPS has an unspoken policy and practice to exclude students from Banneker who require [Individual Education Plans]," Am. Compl. ¶¶ 171, 252, instead diverting them to "one of the District's allegedly 'easier typical' high schools" where they may obtain less prestigious and less rigorous individualized instruction, *id.* ¶¶ 170, 251.  Relying on a "Dear Colleague" Letter from the Department of Education, Reid-Witt argues that such a policy violates the Rehabilitation Act and the ADA.  *See* Opp'n at 17 (citing Asst. Sec'y Stephanie J. Monroe's Ltr. of Dec. 26, 2007, ECF No. 10-1).

Reid-Witt supports her allegations with both anecdotes and data.  She first points to hearing testimony from a Banneker teacher averring that "he had not taught a single student with an [Individual Education Plan] at Banneker in the 13 years he had been [a] teacher [there]." Am. Compl. ¶¶ 175, 256.  Reid-Witt next cites a report from the District of Columbia Auditor that noted stark disparities between selective and non-selective DCPS high schools in the number of students with disabilities.  *See* Opp'n at 17 (citing Office of the D.C. Auditor's Report of May 24, 2019 ("Auditor's Report") at 2, ECF No. 10-2).  According to the Report, the population at Banneker looks very little like the student body at non-selective high schools.  Auditor's Report at 2.  At the far ends of the spectrum, 35% of the students at Anacostia High School have disabilities; Banneker has zero.  *Id.*  The District's other selective high schools have similar figures.  *Id.*  The Report quotes hearing testimony stating that "[i]t is common knowledge . . . that there are certain DCPS schools considered so 'elite,' they simply refuse to comply with special education laws[,] and DCPS central leadership does nothing about it.'"  *Id.* at 1.

16

Taken together, Reid-Witt essentially alleges that DCPS has a policy or practice of excluding all disabled students from its elite high schools by failing to fund special-education services at those schools. Reid-Witt therefore contends that Banneker's determination that C.W. was ineligible for those services was mere pretext; that C.W. could have maintained her grades and performed community service if she had received necessary special-education services; and that DCPS funneled C.W. to a less prestigious school to avoid having to spend money on special-education programs at Banneker. Am. Compl. ¶¶ 165–75, 245–56.

The District's arguments in response to that claim are unavailing. It first argues that the statutes do not require schools to offer home instruction because such accommodations are unreasonable as a matter of law. Mot. at 14–15. In any case, the District continues, the fact that C.W. was entitled to a free, public education does not mean that she had a right to special education *at Banneker*. Reply at 9. In the District's words, it "has not, of course, barred C.W. from attending *every* public school in the District on the basis of her disability"—just the prestigious and academically rigorous schools. *Id.*

To be sure, "where the plaintiff[] seek[s] to expand the substantive scope of a [government] program . . . , they likely seek a fundamental alteration to the existing program . . . and have not been denied meaningful access." Mot. at 14 (quoting *Am. Council of the Blind*, 525 F.3d at 1267). But *American Council of the Blind* dealt with summary judgment, *see* 525 F.3d at 1260, and the Court cannot make a factual determination about whether it is overly burdensome for DCPS to offer special-education services at Banneker on a motion to dismiss. Moreover, at this early stage, the Court cannot determine whether, as a matter of law, the District is required to offer special education at every school or whether it may consolidate students with Individual Education Plans at a few schools. The Parties have not meaningfully briefed that issue and, in

17

light of the Department of Education's letter and the D.C. Auditor's Report that Plaintiff attached, it is not clear that the District would prevail on the question.

Finally, the District contends that Reid-Witt has not successfully alleged that C.W. was qualified for special education in the first place, so she cannot credibly allege that DCPS denied her any benefit to which she was entitled whether or not such a policy exists. Reply at 8–9. In the District's view, even if C.W. were eligible for an Individual Education Plan, those additional services would not have enabled her to perform the required number of hours of community service to maintain her enrollment at Banneker, so she cannot claim that she was a "qualified individual" under the Acts. *Id.* (citing *Smith v. District of Columbia*, No. 16-cv-1386, 2018 WL 4680208, at *9 (D.D.C. Sep. 28, 2018) (finding no discrimination where disabled student was denied opportunity to take Advanced Placement courses because he did not meet the generally applicable eligibility criteria); *Vergara v. Wesleyan Acad., Inc.*, No. CV 17-1013, 2019 WL 4199911, at *12 (D.P.R. Sep. 4, 2019) (finding no discrimination where disabled student could not achieve requirements for maintaining enrollment at selective private school)).

It may be the case that, even with an Individual Education Plan, C.W. would not have been able to succeed at Banneker. As the District points out, Reid-Witt admits that C.W. did not complete a private homeschooling curriculum during her senior year, so it is questionable whether she would have done any better with home instruction provided by DCPS. *See* Mot. at 15 n.7. The Court cannot answer those questions on a motion to dismiss, however, especially when the question of C.W.'s eligibility for special education remains a live issue under Count I. The Hearing Officer answered that question in the negative, Am. Compl. ¶¶ 94–95, but the Court has not yet upheld or overturned that decision. *Smith* and *Vergara* were both resolved on

summary judgment with the benefit of fully developed evidentiary records, so their applicability here is limited. *See Smith*, 2018 WL 4680208 at *1; *Vergara*, 2019 WL 4199911 at *1.

If the Court eventually finds that C.W. was not eligible under the IDEA, it is doubtful that she will be able to sustain a claim that the District's alleged policy-or-practice of denying services at Banneker led to any discrimination against her because of her disability. At this early stage, however, the Court must take the Amended Complaint's allegations as true. *Holy Land Found. for Relief & Dev.*, 333 F.3d at 165. And assuming that C.W. was, in fact, eligible for an Individual Education Plan, and in light of the supporting documentation Reid-Witt has provided, it is plausible that the District (1) has a policy or practice "to exclude [such] students from Banneker;" (2) following that policy, denied Reid-Witt's requests for additional services under the pretext that C.W. was ineligible for them, and (3) counseled her out of the school so as not to have to fund special education at Banneker. Am. Compl. ¶¶ 170–75; 251–56.

That claim plausibly alleges bad faith or gross misjudgment on the part of DCPS. In *Douglass*, the plaintiff alleged not only that DCPS "failed to fully implement" the student's Individual Education Plan but also that DCPS "discriminated against Plaintiff solely based upon his disability because it provided only regular education students with the opportunity to earn [graduation credits] and work toward a regular high school diploma, but did not provide the same opportunity to special education students." 605 F. Supp. 2d at 168 (internal quotation omitted). The Court held that Douglass had stated a claim under the Rehabilitation Act because such a policy facially discriminated against special-education students.[4] *Id.* Here, Reid-Witt has alleged not only that DCPS improperly denied C.W.'s requests for special education because it

---

[4] The Court dismissed the claims for failure to exhaust administrative remedies. 605 F. Supp. 2d at 169. That result is irrelevant here, where the District does not argue failure to exhaust.

found that she was ineligible, Am. Compl. ¶¶ 101–69; 176–250, but also that DCPS has a policy or practice of denying such requests without seriously investigating whether a student is eligible because Banneker lacks the capability to provide them, *id.* ¶¶ 170–75; 251–56.  That sort of exclusion—removing a student from an elite school because she needs special education while telling her that she does not qualify for such services—may constitute discrimination solely by reason of C.W.'s disability.  Such allegations, if proven, might constitute bad faith or gross mismanagement and therefore state a claim for disability discrimination under the Rehabilitation Act, the ADA, and the DCHRA.  *Douglass*, 605 F. Supp. 2d at 168.

## IV.    Conclusion

To the extent that Reid-Witt alleges that the District improperly evaluated C.W.'s educational needs, provided insufficient accommodations, or was less responsive to Reid-Witt's communications than she would have liked, she may obtain relief through her IDEA claim.  Reid-Witt has not alleged additional facts that bring her claims within the scope of the Rehabilitation Act, ADA, or DCHRA, and Counts II and III are dismissed in as far as they make such allegations.  The portions of Counts II and III alleging that the District has an illegal policy or practice of excluding students requiring special education from its selective high schools, however, state a claim for relief and may proceed.  An Order will be issued contemporaneously with this Memorandum Opinion.

DATE:  September 3, 2020

_____
CARL J. NICHOLS
United States District Judge